## Toe *versus* Toe.

1. To take a parol contract for the sale of lands out of the operation of the statute of frauds, it is essential to prove distinctly the terms of the contract, and that it was binding on both parties.

2. Notorious and exclusive possession must be taken and maintained in pursuance of the contract.

3. Valuable improvements must have been made in pursuance of the contract, which have not been compensated by the profits of the land, and cannot be compensated in money.

4. Declarations of a father, such as " I have given John the farm," " The farm is John's," " I intend John to have the farm," are utterly insufficient to establish any binding contract. They are referable to testamentary intentions rather than to a contract; and the fact of a will having been made in accordance with these expressions negatives rather than supports a contract, even though the son may have acted on the expectations thus created.

ERROR to the District Court of *Alleghany County:*

This was an action of ejectment, brought by *Joseph Toe* v. *John Toe,* his son, for a tract of land of 85 acres in Chartiers township. Before the trial of the case in the court below, Joseph Toe died, and his daughters, Mrs. Silk and Mrs. Achelson were substituted as plaintiffs, each claiming an undivided third under the will of their father, made a few days before the suit was brought. The remaining third was devised to his son, the defendant. The plaintiffs showed the legal title in Joseph Toe from 1809, and the last will of Joseph Toe, dated March 23, 1858.

Defendants claim by parol sale in 1832 and possession, since that time, with improvements, and called witnesses in support of their claim. Samuel Graham testified that in 1833 he was at Toe's when John was lying sick (having returned from a trip down the river), and the old man said: " He always intended to give John this farm, if he would only stay and take care of it. If he ever got well and went down the river again he would sell the farm over his (John's) head and put the money in his pocket, and John might then go and push for himself. I never knew any one to occupy the farm from that time to the present but John, although the old man was living on it:

[Toe v. Toe.]

John did all the selling, marketing, &c." Mrs. Toe died in 1850.

Samuel Frew testified that in 1848 he was contractor for the carpenter work of a house, built on the farm, worth about $1,500. That John did the business, made the contracts, &c. That the brick were burnt on the place, and the stone and timber obtained from the farm, and that the hands were boarded on the farm, old Mrs. Toe being housekeeper.

Samuel Lee testified that he had hauled joists for the new house in 1848. "I saw the old man Toe there and Mrs. Toe; he told me that John was going to build himself a house; that he had given him the farm, and that he would have a good deal of heavy hauling up the hill before the house was built; he said that John was to keep him and the old lady as long as they lived; I don't know who had possession of the farm, John or the old man, they all lived together.

James Trunick testified that at one time, the old man said the arrangement between them was that John was to keep them and have the farm. The impression on my mind is, that John was to keep them and have the place at their death. The old man said it would be time enough then, and that it was right enough for a man to hold the title while he lived.

It was in evidence that John had transacted the business of the farm for many years, but that the whole family lived together, and that most of the family expenses were paid by marketing, &c., by old Mrs. Toe and the daughter. That after Mrs. Toe's death in 1850, the old man and John lived together in the new house. That John married in the spring of 1857, and that in December, 1857, the old man went to live with his daughter, Mrs. Achelson, about a mile distant from the farm, and that he died in May, 1859.

The plaintiffs called various witnesses in rebuttal.

It was shown that the farm was assessed to the old man from 1809 to the time of his death.

William Perkins testified that he was assessor from 1843 to to 1853; that in assessing the farm he sometimes saw the old man, sometimes John, and sometimes both together; I assessed the farm to the old man, by their direction; I assessed John as a single man by his direction.

Nathaniel Patterson testified that he lived on the adjoining farm from 1825 to 1837; that he was very intimate with the old man; I never knew any change in the possession from 1831 to 1837; I wrote his will in 1833; the old gentleman and his wife, John and Margaret (Mrs. Achelson) constituted the family; Margaret did the marketing; either the old gentleman or the old lady called and requested me to come up; I wrote the will at my own house, and took it up to the old man's

house; read it over to him, and he signed it; I left the will with the old man; my impression is the farm was left to John, he paying certain legacies; recollect the girls were named, but don't recollect the amount."

Stephen Woods testified that since 1835 he had three times run lines between the Toe farm and adjoining farms, and that in each case the old man acted as owner, when there was a dispute as to the line.

Moses Chess testified to having destroyed the will of 1833, by the old man's directions, who said "it was my will at one time, but is not now." Other witnesses testified to various acts of ownership exercised by the old man down to the time of his leaving the farm in December, 1857.

The court below, WILLIAMS, J., charged the jury as follows:

"The plaintiffs have shown title under the will of their father, to the undivided two-thirds of the land described in the writ. The defendant claims the land under a parol contract with his father, but the evidence in support of his title, under the alleged contract, fails in two essential particulars.

"1. It does not show that defendant took, and maintained possession of the land, under and in pursuance of the contract.

"2. It does not show that he. made such improvements thereon as cannot be reasonably compensated in damages.

"Nor is the defendant's title, under the contract, strengthened by his possession, as that was not adverse or exclusive. The evidence wholly fails to establish such part performance of the alleged contract as will take the case out of the statute of frauds and perjuries, and therefore the court declines to charge, as requested, in defendant's points, and instruct the jury that the plaintiffs are entitled, under the will of their father, to recover the undivided two-thirds of the land in controversy."

Which instruction of the court, and the refusal to affirm any of the eleven points submitted by defendant's counsel, were assigned for error.

*Watson*, for plaintiff in error, cited *Zimmerman* v. *Wengert*, 7 Casey, 401; *Johnson* v. *McCue*, 10 Casey, 180; *McKee* v. *Phillips*, 9 Watts, 85.

*Ewing* and *Woods*, contra, cited *Greenlee* v. *Greenlee*, 10 Harris, 225; *Moore* v. *Small*, 7 Harris, 461; *Rankin* v. *Simpson*, ib. 471; *Eckert* v. *Eckert*, 3 Penn'a Rep. 332; *Poorman* v. *Killgore*, 2 Casey, 374; *Cox* v. *Cox*, 7 Casey, 375; *Blakesley* v. *Blakesley*, 10 Harris, 237; *Dougan* v. *Blocher*, 12 Harris, 28.

The opinion of the court was delivered, November 6, 1860, by

[Fogle *v.* Lycoming Mutual Ins. Co.]

STRONG, J.—The plaintiff in error had not even the shadow of a case in the court below. Were such a title as he asserted to be sustained, the statute of frauds would be a dead letter. And even without the statute he must have failed, for the evidence did not show even an attempt to sell by a parol contract. There was no proof of any contract at all. No witness brings the parties together bargaining respecting the title to the farm, and no witness proves that the old man ever said that he had made a contract with John to make him a title to it. Loose declarations of a father, that a farm is his son's, that he had given it to him, that he intended him to have it, or others of like import, are utterly insufficient to establish the existence of any binding contract. They are such expressions as every father uses, who has put a son in possession of a house or farm, and they are made without the father's dreaming that he is talking himself out of his property. In this case they may all be accounted for by the fact that the old man had made his will, and therein devised the property to his son, a will which he afterwards revoked—and if any contract was ever made, there is an entire absence of evidence to show what were its terms and stipulations, or even that it was binding upon the son.

Nor does it appear that any possession was taken under a contract, or maintained notoriously and exclusively. All the improvements made appear to have been fully compensated by the produce of the farm. We think, therefore, the plaintiff in error's case without any merit, and the District Court correctly instructed the jury to render a verdict against him. It is hardly necessary to say that there was nothing in the will of 1833 to take the case out of the operation of the statute of frauds and perjuries.

Judgment affirmed.

See *Miranville* v. *Silverthorn*, 1 Grant's Ca. 410.